United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| LUIS HURTADO LUCERO,<br><br>Plaintiff,<br><br>v.<br><br>IRA SERVICES, INC., et al.,<br><br>Defendants. | Case No. 18-cv-05395-LB<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Re: ECF No. 92 |

**INTRODUCTION**

Plaintiff Luis Hurtado Lucero invested $350,000 in retirement savings into a self-directed individual retirement account ("IRA") called the "Lazzaro & Associates five-year trading portfolio" (the "Program") based on the promise that the Program would pay him $2,000 per month, tax free, for five years and then return his principal or let him renew his investment for another five years.[1] The Program allegedly turned out to be an illegal Ponzi scheme.[2] In his first amended complaint ("FAC"), the plaintiff sued Christopher Lazzaro and William Peavey, who allegedly ran the Ponzi scheme, and IRA Services and IRA Services Trust Company (collectively, the "IRA Defendants"), the custodian and administrator of the plaintiff's IRA account, charging

---

[1] Second Am. Compl. ("SAC") − ECF No. 90 at 2 (¶ 1), 7 (¶ 26). Citations refer to the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id*. at 2 (¶ 1).

ORDER – No. 18-cv-05395-LB

(1) violations of the federal Racketeer Influenced Corrupt Organizations Act ("RICO") (against all defendants), (2) unfair and fraudulent conduct in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 (against Messrs. Lazzaro and Peavey), (3) breach of contract (against Messrs. Lazzaro and Peavey), and (4) aiding and abetting (against the IRA Defendants).[3] The IRA Defendants previously moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss all claims, and the court granted the motion, dismissing (1) the RICO claims with prejudice because the Private Securities Litigation Reform Act of 1995 barred them and (2) the aiding-and-abetting claim, without prejudice and with leave to amend, because the plaintiff did not identify the duty that the IRA defendants allegedly breached, the IRA Defendants' knowledge of any breach, or the IRA Defendants' substantial assistance in any breach.[4]

The plaintiff filed a second amended complaint ("SAC") raising the same claims against Messrs. Lazzaro and Peavy and an amended claim of aiding and abetting against the IRA Defendants.[5] The IRA Defendants moved to dismiss under Rule 12(b)(6). The court grants the motion and dismisses the claim against the IRA Defendants with prejudice.

## STATEMENT

The fact allegations in the SAC about the Ponzi scheme are essentially unchanged, and the court thus relies on its summary of the scheme in its earlier order.[6] The following account summarizes the fraud and identifies the new allegations about the IRA Defendants.

Mr. Peavey introduced the plaintiff to "the other members of the RICO enterprise," including Mr. Lazzaro and the IRA Defendants, "and together, they convinced [the p]laintiff to participate in the Program."[7] Between October 2012 and January 2013, the plaintiff invested $358,013.21 in the

---

[3] First Am. Compl. ("FAC") − ECF No. 74 at 13−18 (¶¶ 45−76).

[4] Order − ECF No. 89 at 11.

[5] SAC − ECF No. 90 at 10−16 (¶¶ 45−78).

[6] Blackline of SAC − ECF No. 90-1; Order − ECF No. 89.

[7] SAC − ECF No. 90 at 6 (¶ 25). The allegation that the IRA Defendants were part of the "convincing" is new. Blackline of SAC − ECF No. 90-1 at 14 (¶ 25).

Program through his self-directed IRA.[8] The IRA Defendants were the administrator and custodian of the IRA account (and charged custodial fees of between $180 and $360 per year).[9] Messrs. Peavey and Lazzaro introduced the plaintiff to the IRA Defendants "in order to provide legitimacy to" the Program.[10] The IRA Defendants aided and abetted the "RICO Enterprise" (essentially, Messrs. Peavey and Lazzaro).[11]

The plaintiff's $358,013.21 investment was used to buy "private common stock and membership units" in two companies, Liber Abaci, Inc. and Enterprise Technologies, LLP (later registered as Atlas Enterprise Technologies, LLP ("AET").[12] In October 2012, the IRA Defendants transferred $10,000 from the plaintiff's account to Atlas Management, Inc. (presumably a management company for AET) to buy 100 membership units of AET at $100 per share.[13] Over December 2012 and January 2013, the IRA Defendants transferred $340,000 from the account to Liber Abaci to buy 17,000 shares of Liber Abaci stock at $20 per share.[14]

The plaintiff received monthly and then quarterly payments for a while and withdrew $7,000 from his IRA account.[15] But in September 2014, he did not receive the third-quarter payment and received no payments thereafter.[16]

From 2012 to September 2014, the plaintiff's quarterly financial statements showed his investment of $350,000 and his shares of Liber Abaci and AET (valued at $20 and $100 a share,

---

[8] SAC − ECF No. 90 at 7 (¶ 27).

[9] *Id.* at 3 (¶ 5).

[10] *Id.* at 2 (¶ 1). This is a new fact. Blackline of SAC − ECF No. 90-1 at 4 (¶ 1).

[11] SAC − ECF No. 90 at 2 (¶ 3). This allegation echoes the allegation in the FAC and the SAC at 4 (¶ 11). SAC − ECF No. 90 at 4 (¶ 11); FAC − ECF No. 74 at 4 (¶ 11); Blackline of SAC − ECF No. 90-1 at 5 (¶ 3).

[12] SAC − ECF No. 90 at 6−7 (¶ 26).

[13] *Id.* at 7 (¶ 28).

[14] *Id.*

[15] *Id.* at 7−8 (¶¶ 29−30).

[16] *Id.* at 8 (¶ 31).

ORDER – No. 18-cv-05395-LB           3

respectively).[17] In September 2016, his account balance dropped from $350,000 to $12,723.72.[18] The statement — without further explanation — said that the Liber Abaci shares were valued at $0.16 per share "on 11/20/2012" (which presumably is November 30, 2012 because that is the date specified in the FAC and later in the SAC).[19] The plaintiff alleges that this meant that the IRA Defendants knew that the share value of Liber Abaci stock "was actually much lower than what they were reporting to [the p]laintiff between 2013 and 2016."[20] Also, "[t]his is particularly distressing since IRA Services and IRA Trust Co. wired money out of [the plaintiff's] account in the amount of $40,000 on January 18, 2013 for the purchase of additional 2,000 Liber Abaci shares, when they knew that the shares were actually valued at $0.16."[21] In December 2016, the IRA Defendants mailed the plaintiff a corrected account statement that changed the date of the $0.16 Liber Abaci share valuation from "11/30/2012" to "3/31/2013," a date after his "Liber Abaci investments were made."[22]

The plaintiff alleges that all defendants, including the IRA Defendants, knew that the share valuation of Liber Abaci stock was $0.16 per share when he bought it, not the $20 per share that he paid.[23] Specifically, Mr. Peavey held an account with the IRA Defendants and, on November 26, 2012, bought 25,000 shares of Liber Abaci at $0.16 per share.[24] IRA Services Trust Company administered this transaction, as shown by a company stamp on the subscription agreement.[25] The plaintiff purchased 15,000 shares at $20 per share (a $300,000 investment), and IRA Services Trust Company administered this transaction too, as shown by a company stamp on the

---

[17] *Id.* (¶ 33).

[18] *Id.* (¶ 34).

[19] *Id.* (¶¶ 34−35). The FAC reports this date as November 30, 2012. FAC − ECF No. 74 at 10 (¶ 35). Later in the SAC, the date is November 30, 2012. SAC − ECF No. 90 at 9 (¶ 36).

[20] SAC − ECF No. 90 at 8 (¶ 35)

[21] *Id.*

[22] *Id.* at 9 (¶ 36).

[23] *Id.* (¶¶ 39−40).

[24] *Id.* (¶ 40)

[25] *Id.*

subscription agreement.[26] On December 3, 2012, the IRA Defendants transferred the plaintiff's $300,000 investment "directly into Liber Abaci's" bank account "without any authorization from Plaintiff . . . ."[27]

The IRA Defendants then transferred an additional $40,000 into Liber Abaci's bank account to buy more Liber Abaci shares at $20 per share in January 2013.[28] The plaintiff alleges that the IRA Defendants knew of the $0.16 share valuation at the time he purchased his Liber Abaci shares and falsely reported the shares as valued at $20 per share through September 2016, before "inadvertently" disclosing the $0.16 share valuation.[29]

Liber Abaci and AET were created shortly before the plaintiff began participating in the Program for the sole purpose of defrauding him, with the money that was used to buy shares in those companies then being transferred to Messrs. Peavey and Lazzaro.[30] The Franchise Tax Board suspended Liber Abaci and AET in October 2014.[31] The plaintiff cannot withdraw the remaining assets in his IRA Services account because Liber Abaci and AET cannot be contacted.[32]

The SAC alleges the following additional paragraphs in the aiding-and-abetting claim:

> 74. At all relevant times, Defendant Lazzaro and the other individual members of the RICO enterprise owed and owe fiduciary duties to Plaintiff, by virtue of their decision to retain control over Plaintiff's retirement funds and use them to purchase Liber Abaci and AET shares/membership units.
>
> 75. IRA Services and IRA Trust Co. knew or consciously disregarded that at all relevant times the conduct of the other members of the RICO enterprise constituted a breach of fiduciary duties owed to Plaintiff and/or was otherwise tortious.
>
> 76. Despite the SEC's publication, "Investor Alert: Self-Directed IRAs and the Risk of Fraud," wherein the SEC warned that self-directed IRAs lack transparency and oversight, Defendants IRA Services and IRS Trust Co. knowingly aided and abetted other members of the RICO enterprise, who owed fiduciary duties to the Plaintiff, in their breaches of fiduciary duty, as described throughout this Complaint,

---

[26] *Id* (¶ 41). This paragraph does not have a date for the purchase.

[27] *Id.* at 9−10 (¶ 42).

[28] *Id.*

[29] *Id.* (¶ 43); *see also id.* at 9 (¶ 39).

[30] *Id.* at 4 (¶ 10), 9 (¶ 38), 9–10 (¶ 42).

[31] *Id.* at 9 (¶ 38).

[32] *Id.*

including without limitation, by: (i) processing Plaintiff's Subscription Agreement for Liber Abaci shares at $20.00 per share, knowing that Peavey's Subscription Agreement for the same shares earlier that day was processed at $0.16 per share; (ii) transferring Plaintiff's retirements funds to the other members of the RICO enterprise without approving those transfers with Plaintiff, yet showing the $350,000 in the IRA account as "Account Balance"; (iii) actively concealing their knowledge of the Liber Abaci share valuation at the time of Plaintiff's investments in their quarterly financial statements, when the September 2016 statement showed that they had knowledge of the correct share valuation as of **November 2012** (before Plaintiff made any investments with the RICO Enterprise); and (iv) taking additional steps to cover up their knowledge of the Liber Abaci share valuation at the time of Plaintiff's investments by sending an amended financial statement in December 2016 and changing the valuation date to **March 2013**.

77. Defendants IRA Services and IRA Trust Co. knowingly and substantially assisted the other Defendants and non-parties, by and through their own actions and inactions that allowed, facilitated, or permitted the other members of the RICO enterprise to engage in the wrongful acts and conduct that violated various laws and which constituted a breach of their fiduciary duties to Plaintiff, as described herein.[33]

## STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds upon which they rest. *See* Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (internal citations omitted).

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, which when accepted as true, "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when

---

[33] SAC – ECF No. 90 at 15–16 (¶¶ 74–77). The relevant changes in the aiding-and-abetting claim from the FAC to the SAC are as follows: (1) paragraphs 74 and 76 through 78 are new; and (2) paragraph 75 substitutes "fiduciary" duties for the previous "legal duties." SAC – ECF No. 90 at 15−16 (¶¶ 74−78); Blackline of SAC – ECF No. 90-1 at 36−37 (¶¶ 74−78).

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*[34]

If a court dismisses a complaint, it should give leave to amend unless the "pleading could not possibly be cured by the allegation of other facts." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1182 (9th Cir. 2016) (citations and internal quotation marks omitted). But "leave to amend may be denied when a plaintiff has demonstrated a 'repeated failure to cure deficiencies by amendments previously allowed.'" *Id.* at 1183 (quoting *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)).

## ANALYSIS

"California has adopted the common law rule for subjecting a defendant to liability for aiding and abetting a tort. 'Liability may be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.'" *Casey v. U.S. Bank N.A.*, 127 Cal. App. 4th 1138, 1144 (2005) (some nested internal quotation marks omitted) (quoting *Fiol v. Doellstedt*, 50 Cal. App. 4th 1318, 1325–26 (1996)). "[I]n order to analyze the sufficiency of a claim for aiding and abetting breach of fiduciary duty, [a court] must first 'identify precisely the breach of fiduciary duty for which [the plaintiff] seeks to hold [the defendants] liable.'" *Id.* at 1149 (quoting *Sharp Int'l Corp. v. State St. Bank and Trust Co.*, 281 B.R. 506, 513 (E.D.N.Y. 2002)).

---

[34] The IRA Defendants contend that the plaintiff must plead fraud with particularity under Fed. R. Civ. P. 9(b). Mot. – ECF No. 92 at 5 (citation omitted). As the plaintiff points out, the underlying wrong for the aiding-and-abetting claim is breach of a fiduciary duty, which is not subject to Rule 9(b). Opp'n – ECF No. 95 at 7.

ORDER – No. 18-cv-05395-LB 7

"[L]iability for aiding and abetting depends on proof the defendant had actual knowledge of the specific primary wrong the defendant substantially assisted." *Id.* at 1145. "[S]uspicion and surmise do not constitute actual knowledge." *Id.* at 1147 (quoting *Sharp*, 281 B.R. at 515). "[G]eneral allegation[s] the [defendant] knew the [principal wrongdoers] were involved in 'wrongful or illegal conduct' does not constitute sufficient pleading that the [defendant] had actual knowledge" of a specific breach of duty sufficient to plead an aiding-and-abetting claim. *Id.* at 1152.

Where, as here, "the wrong for which [the plaintiff] seeks recovery against [the defendants] is the principals' looting of [the plaintiff], the relevant inquiry is whether [the plaintiff] adequately alleges that [the defendants] had knowledge that the principals were diverting monies from [the plaintiff]." *Id.* at 1147 (internal brackets omitted) (quoting *Sharp*, 281 B.R. at 515); *see id.* at 1146 ("'The words "aid and abet" as thus used have a well understood meaning, and may fairly be construed to imply an intentional participation *with knowledge of the object to be attained*.'") (emphasis in original) (quoting *Lomita Land & Water Co. v. Robinson*, 154 Cal. 36, 47 (1908)).

In *Casey*, the California Court of Appeal considered a bankruptcy trustee's contention that banks aided and abetted the conversion of funds by a debtor corporation's officers and trustees. 127 Cal. App. 4th at 1141. The trustee alleged that the banks aided and abetted the principal wrongdoers (the officers and directors) "by allowing them to open accounts with invalid tax identification numbers, which accounts were then used to drain funds from the Estate to the accounts of individual directors, officers, their families and affiliated companies; allowing large sums of cash, often in excess of $250,000 at a time and aggregating some $6 million, to be removed from the banks' cash vaults (in unmarked duffel bags); violating banking regulations and the banks' own internal policies and procedures; allowing obviously forged negotiable instruments to be paid; and, ignoring monetary restrictions ('not to exceed' limits) appearing on the face of individual checks by paying sums in excess of such limits." *Id.* at 1142 (internal brackets and some internal quotation marks omitted). The trustee argued that the banks "willfully ignored clearly fraudulent and criminal activity in order to profit from fees, interest, and other benefits generated by the money laundering scheme." *Id.* (internal quotation marks omitted). The trial court

ORDER – No. 18-cv-05395-LB                    8

did not address the sufficiency of the trustee's aiding-and-abetting claim (and dismissed the complaint on other grounds). *Id*. at 1143–44. On appeal, the Court of Appeal did consider the sufficiency of the claim and upheld its dismissal. *Id*. at 1144.

The Court of Appeal held that trustee had adequately alleged that "the banks knew *something* fishy was going on with the accounts opened by the [officers and directors]." *Id.* at 1149 (emphasis in original). It further held that the trustee had adequately alleged that the banks themselves engaged in "improper *conduct* in their business dealings with the unscrupulous [officers and directors]." *Id.* at 1148 (emphasis in original). But it held that "[t]he second amended complaint contains no allegation [that] the banks knew the [officers and directors] were misappropriating funds from [the company]," and it held that this lack of knowledge doomed the trustee's aiding-and-abetting claim. *Id.* at 1152. "Again, aiding and abetting requires participation in a specific primary wrong 'with knowledge of the object to be attained.' That knowledge was absent here." *Id.* (citing *Lomita*, 154 Cal. at 47). The Court of Appeal explained that the trustee could not satisfy the knowledge element of his aiding-and-abetting claim through a more general allegation that the banks were aware that the officers and directors were engaged in wrongdoing more generally:

> The Trustee attempts to plead around this hole in the complaint by alleging the banks "knew that the [officers and directors] were engaged in wrongful or illegal conduct in breach of their fiduciary duties to the Estate." . . . [T]he complaint must allege the defendant's actual knowledge of the specific breach of fiduciary duty for which it seeks to hold the defendant liable. The Trustee's general allegation the banks knew the [officers and directors] were involved in "wrongful or illegal conduct" does not constitute sufficient pleading that the banks had actual knowledge the [officers and directors] were misappropriating funds from [the company].
>
> Nor is the Trustee's case helped by his allegation the banks knew the [officers and directors] "were making unauthorized cash withdrawals from the banks' accounts in breach of their fiduciary duties to the Estate and were actually involved in a criminal or dishonest and wrongful enterprise and were, at the very least, laundering money." This "kitchen sink" allegation — either carefully parsed out or read as a whole — does not assert the banks had actual knowledge of the misappropriation at issue here.
>
> For instance, the assertion the banks knew the [officers and directors'] "unauthorized cash withdrawals from the accounts" were "in breach of their fiduciary duties to the Estate" does not allege the banks' knowledge those funds

ORDER – No. 18-cv-05395-LB    9

had been stolen from [the company]. The breach of fiduciary duty the allegation alludes to could have been the misappropriation of a corporate opportunity or the fiduciaries' misconduct in connection with those funds which exposed their principal, [the company], to liability.

Likewise, the allegation the banks knew the [officers and directors] were "involved in a criminal and wrongful enterprise" is too generic to satisfy the requirement of actual knowledge of a specific primary violation. Nor is that requirement satisfied by the allegation the banks knew the [officers and directors] were "laundering money." As we have previously noted, California tort law imposes no duty on a bank to investigate or report a depositor's suspicious activities.

Finally, the Trustee's allegation that "each bank acted with knowledge of the primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct" does not satisfy the actual knowledge pleading requirement. This conclusory allegation fails to identify the primary wrong and is not otherwise supported by the rest of the complaint, which fails to allege the banks knew the [officers and directors] were misappropriating funds from [the company]. In reviewing the sustaining of a demurrer, "we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." Applying that standard, the complaint does not allege the banks' actual knowledge of the primary wrongdoing, and thus fails to state a cause of action for aiding and abetting breach of fiduciary duty. Consequently, we conclude the trial court properly sustained the demurrer to this cause of action.

*Id.* at 1152–53 (internal citations omitted).

The plaintiff's aiding-and-abetting claim against the IRA Defendants fails for the reason that the trustee's claim failed in *Casey*. To satisfy his burden of identifying the fiduciary duty (that the IRA Defendants aided and abetted), the plaintiff points to the IRA Defendants' knowledge that Mr. Peavey bought shares of Liber Abaci at $0.16 a little more than a week before the IRA wired money to Liber Abaci for the plaintiff's purchase of shares of Liber Abaci for $20 a share.[35] The

---

[35] SAC – ECF No. 90 at 3 (¶ 8), 9 (¶ 40) (Mr. Peavey bought Liber Abaci shares on November 26, 2012 for $0.16 a share); *id.* at 7 (¶ 28), 9–10 (¶ 42) (the IRA Defendants wired $300,000 from the plaintiff's account on December 3, 2012 to buy Liber Abaci shares for $20 a share); Opp'n – ECF No. 95 at 2−3 (the different share valuations for the two transactions are "[t]he crux of the claim against the IRA Defendants"). In his opposition, the plaintiff says that the IRA Defendants processed Mr. Peavy's $0.16-a-share transaction and the plaintiff's $20-a-share transaction on the same day (November 27, 2012). Opp'n – ECF No. 95 at 2. But he does not allege this in the "fact" allegations in the SAC. SAC – ECF No. 90 at 9–10 (¶¶ 40–42). Later, in his summary of the fact allegations that support the aiding-and-abetting claim, he says that the IRA Defendants processed his "Subscription Agreement for the Liber Abaci shares at $20 per share, knowing that Peavey's Subscription Agreement for the same shares earlier that day was processed at $0.16 per share . . . ." *Id.* at 15 (¶ 76).

fact that Mr. Peavey paid less for his Liber Abaci shares does not adequately plead that the IRA Defendants knew that Messrs. Lazzaro and Peavy were breaching their fiduciary duty to the plaintiff.[36] And because the plaintiff does not plead that the IRA Defendants participated in Messrs. Lazzaro's and Peavey's alleged wrongdoing "'with knowledge of the object to be attained,'" his aiding-and-abetting claim fails. *Casey*, 127 Cal. App. 4th at 1152; *accord McFall v. Stacy and Witbeck, Inc.*, No. 14-cv-04150-JSC, 2016 WL 6248882, at *2, *6 (N.D. Cal. Oct. 26, 2016) (holding that allegations that company CEO and outside valuation firm manipulated valuation to drive up stock price did not plead that valuation firm aided and abetted CEO's breach of fiduciary duty to shareholders, because "the allegations do not support a plausible inference that [valuation firm] had actual knowledge that [CEO] was seeking to manipulate the stock price to ensure that Plaintiff and other shareholders received less money than they deserved").

Also, as discussed in the court's earlier order, the plaintiff did not plead that the IRA Defendants substantially assisted in the other defendants' wrongdoing.[37]

## CONCLUSION

The court grants the IRA Defendants' motion to dismiss. Because the plaintiff has not pleaded a cognizable claim against the IRA Defendants in the three complaints that he has filed to date, the dismissal is with prejudice. *Eminence Capital*, 216 F.3d at 1052. This disposes of ECF No. 92.

**IT IS SO ORDERED.**

Dated: February 3, 2020

LAUREL BEELER
United States Magistrate Judge

---

But that is inconsistent with his earlier allegations. *Id.* at 9–10 (¶¶ 40–42). In any event, even if the transactions were on the same day, the court's analysis under *Casey* is unchanged.

[36] The plaintiff alleges that Mr. Peavy introduced the plaintiff to Mr. Lazzaro and the IRA defendants, "and together, they convinced [the p]laintiff to participate in the Program." SAC – ECF No. 90 at 6 (¶ 25). The allegation is conclusory. The plaintiff does not allege non-conclusory facts that support an inference that the IRA Defendants had knowledge of any relationship between Messrs. Lazzaro and Peavey, on the one hand, and Liber Abaci and AET, on the other, or their alleged conversion of the plaintiff's money.

[37] Order – ECF No. 89 at 11.